**SANFORD RESEARCH COMPANY and
Sanford Ink Company, Plaintiffs-Appellants (Cross-Appellees),**

v.

**EBERHARD FABER PEN AND PENCIL
CO., Inc., Defendant-Appellee
(Cross-Appellant).**

Nos. 15994, 15995.

United States Court of Appeals
Seventh Circuit.

June 21, 1967.

Rehearing Denied July 25, 1967.

John N. Cooper, New York City, D. D. Allegretti, Bair, Freeman & Molinare, Chicago, Ill., (for Eberhard Faber). Pern E. Henninger, Cooper, Dunham, Dearborn & Henninger, New York City, of counsel.

Richard R. Trexler, Richard Bushnell, Edward H. Hickey, Chicago, Ill., James B. Moran, Chicago, Ill., for Sanford Research. Olson, Trexler, Wolters & Bushnell, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., of counsel.

Before DUFFY, Senior Circuit Judge, KNOCH and CUMMINGS, Circuit Judges.

DUFFY, Senior Circuit Judge.

Plaintiffs sought damages and injunctive relief for alleged patent infringement [Count I] and for unfair competition [Count II]. The District Court decided for the defendant on each count. In addition, the District Court awarded the defendant the sum of $11,000 as attorney fees on the ground that Count II of the complaint was brought "without justifiable grounds, was baseless and vexatious."

Plaintiffs appeal from the judgment dismissing Count I, and the awarding of attorney fees with respect to Count II. Although plaintiffs state they believe the findings and conclusions of the District Court on the merits of Count II are erroneous, they have not appealed from the judgment dismissing that Count.

Defendant cross-appeals from the judgment insofar as it did not allow the total amount of attorney fees requested in connection with Count II, and further, insofar as it did not allow defendant any attorney fees in connection with successfully defending against Count I. Defendant does not press its appeal for further allowance of attorney fees as to Count II, but insists upon an allowance of attorney fees as to Count I.

The Lofgren Patent in suit, U. S. Patent No. 3,089,182, was issued to Charles W. Lofgren on May 14, 1963. Sanford Research Company is the owner of the patent and has the right by assignment to recover for past infringements. It has licensed Sanford Ink Company under the patent.

The patent in suit relates to a liquid marking device which plaintiffs describe as a throw-away felt-tip marker. These markers use a special volatile ink which enables them to mark upon almost any surface.

All patent drawings and the physical embodiment indicate that the body of the marker shall be a one-piece, seamless, extruded metal shell having an integral bottom and an initially wide-open upper end.

The marker is filled with ink by an injection into a felt pad which retains the ink until used. The pad, sometimes referred to as reservoir, has dimensions similar to those of the shell, and is inserted through the upper end of the shell. The reservoir is then pushed to the bottom of the shell.

The upper end of the shell is then reduced in diameter by subjecting it to a series of reducing dies mounted in a press. This forms the body of the marker with an elongated neck or ferrule portion. This process is referred to as a necking operation.

After the necking operation is completed, a self-supporting wick-like marking element is inserted into the neck. The wick is pushed down until the lower end engages the felt reservoir. Then a "staking" tool is used to pinch parts of the neck inwardly for gripping limited areas of the wick element, thereby retaining the element in position while leaving venting passageways along a side of the wick. Finally, a removable cap is placed over and sealingly engages the outer periphery of the neck portion.

On the issue of validity, the District Court found lack of novelty; also, that the patent was invalid " * * * because there was no invention in making in-

tegral that which existed in two or more parts * * *"; further, that the Lofgren patent was invalid because it was obvious to a person having ordinary skill in the art, and that Lofgren merely made a selection of elements old in the art unaccompanied by any unexpected improved result. The Court also found misrepresentations by plaintiffs as to the date of the alleged invention, and that a French Patent, No. 1,063,019 issued to Williams et al. was also a bar.

About 1958, Sanford became interested in producing a felt-tip, throw-away marker. The Magic Marker, the Marks-A-Lot marker, the Cado marker and others were examined. Plaintiffs concluded that these markers permitted too much leakage or evaporation of the volatile ink used. Some were too bulky to be comfortably used as a writing instrument or marker. Some were too expensive to produce. The cost of production was an important item in a throw-away marker.

After many months of investigation and experimentation, the Sanford marker was conceived. In the spring of 1959, Sanford contacted Hampton Products in order to obtain Hampton's aid in placing the Sanford device in production. More particularly, Sanford sought help in assembling the felt reservoir within the impact extruded aluminum shell and subsequently "necking" the upper end of the shell. Hampton's president, Ward, disclaimed any knowledge of felt-tip marking devices.

Sanford completed and tested specimens of its marker in June, July and August, 1959. Several small but important manufacturing problems were solved. However, it was not until February 1960 that Sanford was able to place its marker on sale to the general public.

One company requested and received a non-exclusive license from Sanford. Several other companies asked Sanford to produce private brand markers for them. Hampton participated in processing more than sixteen million of the Sanford device in a period of some three years.

For some ten years prior to the introduction of the Sanford marker, defendant Eberhard had devoted much time and effort in developing its marker. It had carefully examined and tested the Magic Marker and similar devices then on the market. Plaintiffs claim that defendant ended its ten-year search for something "different and better" by deciding to copy the patented structure.

Defendant, well knowing that Lofgren's application for a patent was pending, approached Hampton whom they knew was Sanford's supplier. Defendant's officials testified they did so to get into production as fast as possible, and in order to "enjoy our share of the market as soon as possible."

Hampton thereupon designed and produced Eberhard-Faber's marker. Shortly thereafter the accused marker was introduced to the national market. Plaintiffs say "Thus the defendant was able to accomplish in ten weeks that which it could not by itself accomplish in ten years." No claim is made that defendant's marker does not infringe the patented device except for the trial court's conclusion of law that defendant's markers do not infringe " * * * since an invalid claim cannot be infringed."

The application for the patent in suit had a rather rough trip through the Patent Office. All of the claims were finally rejected as unpatentable over the Rosenthal United States Patent No. 3,050,768 in view of the French Patent No. 1,063,019 to Williams et al.

The Rosenthal patent was removed from consideration by an affidavit by Lofgren filed pursuant to Patent Office Rule 131 to the effect that he had completed the invention prior to August 13, 1959, the filing date of the application on which the Rosenthal patent issued.

Attached to the affidavit were copies of photographs showing a number of test markers and certain of the test reports. These were received in evidence at the trial of the case.

■ Thus the Examiner had before him the information which Lofgren had

when he made his determination that the invention had been reduced to practice. In order for there to be a reduction to practice, there is no requirement that the device be then ready for commercial production. It is necessary only that the device be successfully tested. Hildreth v. Mastoras (1921), 257 U.S. 27, 34, 42 S.Ct. 20, 66 L.Ed. 112; Farrand Optical Co. v. United States, 2 Cir. (1963) 325 F.2d 328, 331–33; Application of Clarke (C.C.P.A.1966) 356 F.2d 987.

We think the fact that further tests were made by Sanford is of no controlling significance. Of interest is the fact that some of these test markers still worked at the time of the trial in spite of the fact that when tested they already had come through fifteen days of accelerated aging tests.

The French patent to Williams et al. was removed from consideration by an affidavit of Walter J. DeGroft, also filed pursuant to Rule 131, to the effect that the shell in the French patent must have a seam traversing the sidewall, the neck portion and at least partially traversing the bottom of the casing.

The French patent device was not a marker. It was a spot remover which moistened a spot with a cleaning fluid and then absorbed the spot back into the wick or into the cloth covering the wick. This result is exactly the opposite from the art of marking or writing. The lack of a venting passageway restricts the flow of the cleaning fluid.

Defendant argues that the DeGroft affidavit was a misrepresentation to the Patent Office with reference to the disclosure of the French patent to Williams. Much is said in the briefs about the correct translation of the French patent. However, we can take judicial notice that the Patent Examiner had available to him the services of a group of foreign language translators employed in the Scientific Library in the Patent Office.

It was and is plaintiffs' position that if a sheet of metal is rolled into a cylinder, it is self-evident that it must have a side seam. The defendant says Fig. 3 of the French patent does not show a seam and, therefore, no seam exists. We do not think such a conclusion necessarily follows. Fig. 3 shows only half of the device. Further, patent drawings are frequently diagrammatic in nature and if so, do not necessarily show the details of construction. In any event, we do not think the French patent teaches the claimed Sanford invention. The testimony showed spinning under the French patent would be completely impractical because it would take two or three minutes to make each container compared with the thirty to forty shells a minute which can be formed by an impact extrusion process.

We conclude that there is no basis in the record before us for the findings and conclusions of the trial court that plaintiffs misled the Patent Office by means of the Lofgren or DeGroft affidavits.

The trial court found the Lofgren marker to be an old combination of elements common in Magic marker, Marks-A-Lot marker and Cado marker. It found that the Lofgren marker "differs from the MAGIC MARKER, the CADO and the MARKS-A-LOT only in that it has a one-piece container having a seamless body, bottom and neck, whereas the MAGIC MARKER container has a seamless body and a unitary seamless bottom with an attached neck; the MARKS-A-LOT has a container with initially extruded and seamless body, unitary seamless neck and a closure welded to an initially open bottom; and the CADO has an initially extruded seamless body and side wall with an attached neck." There is credible evidence to sustain such finding.

The Ozium and Rickford shells were not before the Patent Office. Plaintiffs strongly urge that such shells are in a non-analogous art and also that they were not concerned with the problem of staking the neck against a felt-like marking element while leaving vent passageways. This issue is not without some difficulty.

A suitable container for Lofgren's general conception came to DeGroft's attention at a packaging show held in Chicago in mid-April 1959, where Hampton Products Company had on display an Ozium aerosol device and a Rickford perfume container. Each of these containers was a one-piece, seamless, necked-in, aluminum impact extrusion which Hampton had necked-in with dies and equipment which it had possessed for many years.

Three samples of these shells were shipped by Hampton to plaintiffs in May 1959. Sanford selected the 15 cc container and had Hampton insert absorbent reservoirs in the shells, and then neck-in the open ends with Hampton's dies and press. The containers were then sent to Sanford to be filled with ink, to insert the wicks, to stake the wicks in the neck and to place caps thereon.

██ In view of the trial court's findings, we hold the Ozium and Rickford packages were in an analogous art. We also hold the claimed invention of the patent in suit would have been obvious to a person having ordinary skill in the art to which such subject matter obtains. Graham v. John Deere Co. (1966), 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545. In fact, DeGroft who was skilled in the art quickly recognized that the Ozium and Rickford packages were a solution to his problem.

██ The trial court held that defendant's markers did not infringe " * * * since an invalid claim cannot be infringed." The better practice would be to make an independent finding on the issue of infringement in order to avert unnecessary remand in the event this Court on appeal had found the claims of the patent valid.

██ The District Court was correct in denying to the defendant attorney fees in connection with successfully defending against Count I. This was a hard-fought case. There was legitimate ground for differences of opinion on several of the issues. Under such circumstances, had the trial court made an award of attorney fees, we would have held that such award was not warranted. The controlling rule in this Circuit is "that attorney fees should not be awarded under 35 U.S.C. § 285 except to prevent gross injustice and where fraud and wrong-doing are clearly proved." Sarkes Tarzian, Inc. v. Philco Corporation, 7 Cir., (1965), 351 F.2d 557, 560.

We now consider the award to defendant of $11,000 attorney fees based on the trial court's finding and conclusion that Count II of the complaint alleging unfair competition was baseless and vexatious.

The award of attorney fees may have been a surprise to the defendant. Plaintiffs point out defendant devoted only one sentence of its 76-page post trial brief to the issue of an award of attorney fees under Count II.

Sanford introduced testimony to show that Hampton agreed orally not to produce markers for others as long as it processed the Sanford marker. Sanford's understanding was based upon what it thought was a promise of Lawrence Ward, president of Hampton Products, made to Walter DeGroft of Sanford.

A contemporary memorandum was prepared by DeGroft on July 30, 1959 and is in evidence. In the memorandum, it was stated "When we decide on Hampton for this operation they agree not to do this work or manufacture equipment to do it for any competitor." A copy of the memorandum was sent to Ward.

Ward does not deny receiving the memo. In fact, he agreed to reduce the agreement to writing to be prepared by plaintiffs but for some reason this was never done, and Ward testified at the trial that he regarded the discussion as preliminary. It is quite apparent there was a misunderstanding between the parties.

██ An award of attorney fees in a situation like the case at bar, can be justified "only in exceptional cases and

for dominating reasons of justice." Sprague v. Ticonic National Bank (1939) 307 U.S. 161, 167, 59 S.Ct. 777, 780, 83 L.Ed. 1184. This is not such an exceptional case.

The evidence shows that many of the techniques of the manufacture of Sanford's marker and the "know how" developed on its behalf by Hampton were used by the defendant for its benefit. Sanford had disclosed the general conception and developed the inks and the caps. These and many other things became available to defendant when it started manufacturing the defendant's marker.

In Fleischer v. Paramount Pictures Corporation, 2 Cir. (1964), 329 F.2d 424, 426, cert. den. sub. nom. Fleischer v. A. A. P. Inc., 379 U.S. 835, 85 S.Ct. 68, 13 L.Ed.2d 43, the Court expressed the attitude of American courts on the subject under consideration. "American courts have traditionally refused to include counsel fees in a losing party's bill of costs, except in the most extraordinary of instances, and have virtually never awarded such fees in an action of law. Every litigant, regardless of the seeming frivolity of his claims, is entitled to have them determined on their merits, and not to be 'taxed out court.' " [1]

We hold that the award of $11,000 in attorney fees as to Count II was manifest error and should be vacated.

We affirm the judgment of the District Court that the claims of the patent in suit are invalid because the differences between the subject matter sought to be patented and the prior art would have been obvious at the time the alleged invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103.

We affirm the action of the District Court in denying an award of attorney fees to the defendant in successfully defending against the charges in Count I.

We reverse the award of $11,000 attorney fees to defendant with respect to Count II of plaintiffs' complaint.

Affirmed in part.

Reversed in part.

---

1. The Supreme Court in the current Term reaffirmed the position that American courts, in contrast to the English practice, do not tax attorney fees to the losing party except in the most limited exceptions. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475. (May 8, 1967).