The **SUPERIOR ELECTRIC COMPANY**

v.

**RAYTHEON COMPANY.**

Civ. A. No. 3353.

United States District Court, D. New Hampshire.

Nov. 22, 1972.

William K. Kerr, Fish & Neave, New York City, Robert Upton, II, Upton, Sanders & Upton, Concord, N. H., for plaintiff.

Robert A. Cesari and Martin J. O'Donnell, Cesari & McKenna, Boston, Mass., Lawrence E. Spellman, Sulloway, Hollis, Godfrey & Soden, Concord, N. H., for defendant.

## OPINION

BOWNES, District Judge.

This is a patent infringement case. Plaintiff, Superior Electric Company, is a Connecticut corporation and defendant, Raytheon Company, is a Delaware corporation with a plant in Manchester, New Hampshire. Jurisdiction and venue are based on 28 U.S.C. §§ 1338(a) and 1400 (b).

## THE ISSUES

There are two basic issues:

*1. Prior Art*

Are the differences between the subject matter of the Senetcen Patent and the prior art such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which the subject matter pertains? 35 U.S.C. § 103.

*2. Prior Invention*

Did Senetcen actually invent the subject matter sought to be patented and was he the one who first conceived and reduced the invention to practice? 35 U.S.C. § 102(f) and (g).

A subsidiary issue is whether Raytheon had an identical product "on sale" more than twelve months before the filing of the patent application. 35 U.S. C. § 102(b).

Unlike most patent cases, Raytheon had commercialized a product embodying the claimed invention before Superior had done so and even before the patent application was filed. Since the Raytheon product is identical to the claimed invention, there is no issue as to infringement. If the patent is held valid, Raytheon is necessarily an infringer.

## SUBJECT MATTER EXPLANATION

The patent relates to the use of two silicon controlled rectifiers in an automatic line voltage regulator. Silicon controlled rectifiers became generally available in the late 1950's. They were one of the products of the "solid state" revolution in the electronics field. Both Superior and Raytheon are and have been competitors in the manufacture and sale of automatic voltage regulators.

Automatic voltage regulators have been in use for many years. They are used to regulate the variations in the magnitude of voltage in an electrical circuit. Line voltage regulators, to which the patent relates, are used to regulate voltage supplied by a utility company as it reaches the user from the power line. Since the line voltage may vary in magnitude from 105 volts to 130 volts, the purpose of the regulator is to insure that a constant voltage is supplied to the electrically powered recipient. The recipient is known as a "load." Examples of loads are a light bulb, a power saw, electrically powered surgical instruments in an operating room, X-ray equipment, high speed electrical ovens, and photoenlarger lamps used in color film processing. A voltage regulator could also be used to offset the effects of a "brownout." It is obvious that constant voltage is required for the proper operation of many "loads" used in industry and that automatic line voltage regulators are a vital ingredient of electrical power in our electrically dependent industrial society.

The definition of some basic electrical terms is necessary:

*Current*: The flow of electricity through a circuit. It is measured in amperes.

*Voltage*: The force causing the electrical current to flow through a circuit. A short definition is "electromotive force" or "EMF." It is measured in volts.

*Alternating Current*: A current which moves from side to side as it flows through a circuit. It moves to opposite sides of the line of flow for the same fixed period of time. The shorthand symbol is ∿∿.

*Transformer*: An electrical device for transmitting AC voltage from one electrical circuit (usually the utility company's) to another (that of the user) without changing the frequency of the AC voltage. The voltage flowing into the transformer is called the "input voltage" and the voltage flowing out to the load is called "output voltage." A transformer may decrease ("step down") or increase ("step up") the input and output voltage. It has no moving parts and consists of two coils (also called windings); "primary" and "secondary."

*Autotransformer:* A transformer with one coil or winding. In a step up autotransformer the input voltage is applied to a portion of the coil and the output voltage is derived from the entire coil. In a step down autotransformer the input voltage is applied to the entire coil and the output voltage is derived from a portion of the coil.

*Inductor:* A coil of wire or winding which impedes the flow of AC current.

*Impedance:* The characteristic of impeding the flow of current, i. e., a good conductor has a low impedance and a poor conductor has a high impedance.

*Shunt Path:* An alternative path in a circuit through which current may be directed. In the context of this case, a shunt path always by-passes the load (is "in parallel" with the load) and never leads directly to the load ("in series" with the load).

Automatic voltage regulators consist of two basic components or circuits: (1) the measuring circuit which detects fluctuations in the output voltage and sends a signal to (2) the regulating cir-

cuit which increases or decreases the voltage to the desired strength. The term "buck" is used in the art to describe reducing above-normal voltage to the desired level and the term "boost" to describe increasing sub-normal voltage to the desired level.

## THE PATENT IN ISSUE

The Senetcen Patent, No. 3,370,223, relates to the use of two silicon controlled rectifiers (hereinafter SCR's) in the regulating circuit of an automatic line voltage regulator which can both boost and buck as required. The basic elements consist of an autotransformer, two SCR's in a shunt path with the winding of the autotransformer, a measuring unit that controls the conduction of the two SCR's so as to maintain the desired output voltage, and a choke in series with the two SCR's for decreasing the acceleration of current conduction in the shunt path. It is not claimed that any of these elements are new. No claim is made at all as to the measuring unit. It is the novel combination of the autotransformer, the SCR's in shunt path, and the choke that the plaintiff claims constitutes the invention.

## FINDINGS AND RULINGS

*The Prior Art*

I examine the question of obviousness in the light of the teaching of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) I also reject the defendant's contention that the issuing of the patent does not create a presumption of validity. 35 U.S.C. § 282 provides:

A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it.

I assume that these words mean what the say. Radio Corp. v. Radio Laboratories, 293 U.S. 1, 7–8, 55 S.Ct. 928, 79 L.Ed. 163 (1934); Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937).

The prior art claim of Raytheon focuses on the use of saturable reactors [1] in automatic line voltage regulators, the literature that accompanied the advent of SCR's and two patents; the Hjermstad Patent and the Lichowsky Patent.

Raytheon claims that the Senetcen Patent amounts only to a substitution of SCR's for saturable reactors. The plaintiff concedes that saturable reactors in regulators perform the same function that the SCR's do in the Senetcen Patent. There is no doubt that when SCR's were introduced, they were touted as being replacements for saturable reactors. Exs. M, N, O, P, Q, R, and S. None of the literature, however, suggests that SCR's could be substituted for saturable reactors in voltage regulators by a simple mechanical process. The Harnden article, Ex. M, comparing SCR's with saturable reactors upon which Raytheon relies noted the following:

> Since the controlled rectifier is capable of performing many of the functions of magnetic amplifiers and thyratrons (saturable reactors), it represents another tool with which the engineer should be acquainted. The degree to which this is accomplished will determine the new horizons which are possible in the application area.

The phrase "new horizons" does not connote mere substitution. The cross-examination of Raytheon's expert, Dr. Kusko, revealed that his own application for a patent relative to a voltage regulator in 1963 used a saturable reactor even though he had testified that when SCR's became available (in the late 50's), it was generally recognized that they could be used as substitutes for saturable reactors. T. 425–428. Standing alone, the prior use of saturable reactors in automatic voltage regulators did not make the Senetcen invention obvious; rather, it was an obvious point of departure for a new use of SCR's.

Plaintiff claims that the vital distinction between the Senetcen Patent and the two "prior art" patents, Hjermstad and Lichowsky, is that the Senetcen invention will both buck and boost. As the defendant points out, there is no use of the words buck and boost in the patent; no claim is directly made that the patent will both buck and boost. The claim that is made is:

> It will accordingly be appreciated that there has been disclosed an automatic voltage regulator which produces a substantially constant output voltage with changes in the input voltage and/or the power controlled by the regulator. Senetcen Patent, column 4, lines 64–68.

Claim 4 of the Senetcen Patent says in part:

> . . . to cause greater conduction of the semi-conductor means when the output voltage value is lower than the desired value and lesser conduction of the semi-conductor means when the output voltage value is higher than the desired value. Column 6, lines 16–20.

The omission of the words "buck" and "boost" may be only a matter of semantics, but since the plaintiff's main basis for distinguishing its patent from the two "prior art" patents is the combination of the buck and boost function, the failure to use the two words of art does raise a question as to the basic purpose of the patent. It is the defendant's contention that the output voltage is really an average between the buck and boost levels which is determined by the relative durations of the off and on times of the SCR's. It must be borne in mind that the SCR's act basically as electrical gates or switches which are opened and closed by the measuring unit. It is also to be noted that both of the prior art patents use the words "buck" and/or "boost" in the description of the function of the invention.

---

[1]. As I understand it, saturable reactors include amplistat reactors, thyratrons, and magnetic amplifiers. All of these devices are many times larger than a SCR. See Figure 3, Ex. M.

The Lichowsky Patent is entitled a "Buck Boost Transformer Controlled by Silicon Controlled Rectifier." First, it is noted that the Lichowsky Patent has no phase control. It has one SCR connected in series with the second winding of the transformer across the input terminals. The Lichowsky Patent, technically speaking, has a transformer rather than an autotransformer. This transformer is interposed in series between the alternating current line and the load requiring the regulated voltage. The most important distinction is that the Lichowsky invention can only buck *or* boost; in order for it to be able to do both automatically, the wiring must be altered.

■ The Hjermstad invention uses an autotransformer. This invention has a pair of SCR's in the shunt circuit connected in parallel to the primary winding and in series with a pair of parallel connected SCR's. Like the Senetcen Patent and unlike the Lichowsky Patent, the Hjermstad Patent has phase control. Most importantly, the Hjermstad Patent is concerned only with boosting.

> An object of the present invention is to provide a new and improved regulated power supply capable of providing a constant output voltage over a broad range of lesser input voltages. Column 1, lines 12–15.

> The Second Circuit is selectively operated during the same portions of the cycle for purposes of drawing additional current through the primary winding in such a manner as to generate a *boost* voltage in the secondary winding that is additive with the voltage in the loop. The amount of *boost* voltage added is determined by the period during which the second circuit is conducting and that period is selected to determine the root means square voltage at the output at a predetermined level. Column 1, lines 33–42.

I am excluding the testimony of Mr. Goldenberg starting at page 581 in the Transcript in which he related what he thought the mistakes were that the Patent Examiner made when he examined the Senetcen Patent. It would be improper to explore the mental process of the Patent Examiner and speculate as to how he arrived at his decision. This ruling also eliminates any consideration of the file wrapper which was allowed to be offered by the plaintiff only because I initially allowed Goldenberg's testimony.

In addition to determining the scope and content of the prior art, I must examine the differences between the prior art and the claims at issue with regard to the level of ordinary skill in the pertinent art in the light of the teaching of *John Deere* that:

> Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. 383 U.S. at pages 17–18, 86 S.Ct. at page 694.

In order to effectively assess the effect of the prior art on one skilled in the field, it is necessary to examine the prior invention claims of the defendant.

*Prior Invention*

In 1960 Raytheon produced its so-called Hooksett regulator. It had a second and separate autotransformer to buck the incoming line voltage so that the circuit would normally operate as a boost circuit only. While this regulator was designed to operate in the boost mode only, it did have the capability of bucking and boosting. The Hooksett regulator was developed by contract for the United States Navy, and this is significant because it was built at a time when SCR's were much more expensive than saturable reactors. It is common knowledge that defense contracts with the Government are not based on market costs.

One of the critical aspects of this case is that sometime in the fall of 1962,

probably September, Robert Hyde, an engineer at Raytheon, started work on a SCR regulator. A regulator practically identical to the one developed by Superior was developed and reduced to practice in January of 1963 by Raytheon.

Raytheon claims that its SCR regulators were placed on sale on June 27, 1963. The testimony that Raytheon relies on for establishing prior sale is found at pages 524 and 525 of the Transcript:

Q. If you had received a copy of Exhibit BB on June 27, 1963, how soon thereafter would you have solicited sales for ACR regulators?

A. Yes. Upon receipt of this memo my people and myself would solicit sales in view of the full contents of this particular memo.

Page 4 of Exhibit BB has to do with automatic voltage regulators. Page 1 of the Exhibit says:

In the second half of 1963 we *will* introduce so many new major product lines that competition won't know what to expect next!

The questions are obviously hypothetical. There was no testimony that sales were, in fact, solicited. Such evidence cannot comply with the "on sale" requirements of the statute.

The testimony of Hyde and his notebook entries, Exs. Z and III, shows that he and his associates followed essentially the same process in developing the Raytheon Regulator as Senetcen did, including, initially, the use of fuses to prevent the SCR's from being destroyed by an overflow of the current. Fuses were later eliminated and a winding and then a choke used for this purpose.

The Raytheon SCR regulator was conceived and reduced to practice between September of 1962 and January of 1963. Senetcen started work on his regulator in 1958 and, according to his testimony, it was tested on December 10, 1962, and worked. Transcript, page 99.

The law is clear that:

In order for there to be a reduction to practice, there is no requirement that the device be then ready for commercial production. It is necessary only that the device be successfully tested. Sanford Research Co. v. Eberhard Faber Pen and Pencil Co., 379 F.2d 512, 515 (7th Cir. 1967).

If dates were the only issue on the question of invention, then it would have to be resolved in favor of Senetcen. But there is more to it than that.

A status report of Senetcen's invention was submitted by his supervisor, Eric Vaughn, on January 4, 1963, to the Research and Development Department of Superior. Nothing further was done about the invention by Superior until 1964. In March of 1964 the Raytheon regulators, developed by Hyde and his associates and containing essentially the same circuitry as the Senetcen regulator, were displayed publicly at a trade show. One of them was purchased by Superior and given to Thomas G. Peterson, a Superior engineer, by Mr. Vaughn on July 21, 1964, for testing and analysis. Peterson Deposition, Ex. FFF, page 34. Prior to this time, Peterson had been working on a regulator of the saturable reactor variety and he had no real contact with the Senetcen circuitry until after the Raytheon regulator was given to him for analysis and testing. Peterson, Deposition, pages 7 and 34. Early in September of 1964, Peterson was told by Vaughn to go to work on the Senetcen regulator and get it ready for production. Peterson Deposition, pages 12, 35–36. By the 20th of October, 1964, Peterson had "the kind of regulator which I felt was reproducible at that time." Peterson Deposition, page 38. The Senetcen Patent application was filed November 27, 1964.

Raytheon urges that the Senecten invention was essentially a copy of the Raytheon regulator that had been obtained, tested, and analyzed by Peterson. While this inference can be drawn from

the facts, it means that Senetcen was lying about the dates of his invention and that Peterson was lying about the work he did on the Senetcen circuitry to make it ready for production when he testified in his deposition that the Senetcen circuitry worked when he received the project. Peterson Deposition, page 31. It also means that Superior has engaged in reprehensible conduct and perpetrated a fraud on the Patent Office. Raytheon has stated explicitly that it makes no claim as to fraud on the Patent Office. I specifically find that the Senetcen regulator was developed independently of the Raytheon regulator.

The conclusion is inescapable, however, that until the Raytheon regulator was displayed publicly, Superior either did not realize the potential of the Senetcen regulator or felt that it was not worth patenting. The failure of Superior to apply for a patent on the Senetcen regulator until after its chief competitor put a similar regulator on the market does have considerable bearing on the question of obviousness.

In assessing the effect of the prior art on the Senetcen invention, I must take into consideration the fact that it was not until 1963 and 1964 that the cost of SCR's had been reduced sufficiently to make them commercially feasible in automatic line voltage regulators.

It is the total effect of all of the prior art on the question of obviousness that must be analyzed. Saturable reactors had for many years performed the same function that the SCR's perform in both the Raytheon and Superior regulator. The advent of SCR's in the late 1950's and the accompanying literature made it clear that SCR's had the potential for being used in voltage regulators instead of saturable reactors. The Lichowsky and Hjermstad Patents were definite guideposts pointing to the combination of an autotransformer and SCR's in a shunt path for producing "a substantially constant output voltage."

The development of the Hooksett regulator by Raytheon, which anticipated, at least in part, the Senetcen Patent, shows that where cost was not a major factor, SCR's could be designed into a circuit so as to effectively replace saturable reactors. The independent development by Hyde and his associates at Raytheon of a similar circuitry to that developed by Senetcen at about the same time as Senetcen was developing his regulator must have been more than sheer coincidence. Two novel ideas very rarely spring full blown from the minds of independent inventors at the same time. It was prior art and not inventive coincidence that propelled Senetcen and Hyde along the same path at the same time.

It is significant also that Raytheon did not consider its SCR regulator to be a patentable invention. Hyde testified

It was a circuit that we knew could be made at any time, or a substitution we could have made at any time, and we didn't figure it was a big improvement in the state of the art, although it did meet most of the intents of the sales art. T. IV, page 489.

On January 3, 1963, one of Hyde's co-workers, Saul Dursht, wrote an engineering evaluation on the regulator program that Hyde and others had been working on. Ex. EE. The conclusions are significant.

Systems that had been suggested as being a departure and an advance over the basic "S" or "R" circuitry, have been found to be essentially the same as this old work horse.

A good deal of effort and thought went into brainstorming newer and what we at first thought might be revolutionary ideas. We have come full circle and now understand our task and our capability in a more realistic light. We can now see clearly that any performance specification improvement over the "S" series models will cost in company funding, engineering effort and in eventual final cost to the customer. We feel that we cannot replace the saturable core reactor power controller of the "S" se-

ries by a silicon controlled rectifier power control element, optimize the remaining circuitry, and quickly realize an up-to-date replacement line of a. c. regulator models with somewhat improved specifications.

The critical factor in the development of the SCR regulators by both Superior and Raytheon was not inventiveness, but the reduction in cost of SCR's making their use commercially feasible.

 I rule that the Senetcen Patent is invalid because the subject matter as a whole would have been obvious to a person having ordinary skill in the art.

Judgment for the defendant.

So ordered.