771 F.2d 521
 248 U.S.App.D.C. 329, 54 USLW 2148,
227 U.S.P.Q. 115
 NOXELL CORPORATION, et al., Appellants,
v.
FIREHOUSE NO. 1 BAR-B-QUE RESTAURANT, d/b/a San Francisco
Firehouse Station No. 1, Inc., et al.
NOXELL CORPORATION, et al.
v.
FIREHOUSE NO. 1 BAR-B-QUE RESTAURANT, d/b/a San Francisco
Firehouse Station No. 1, Inc., et al., Appellants,
Peter Lyons, d/b/a Firehouse No. 1 Bar-B-Que Restaurant.
 Nos. 84-5167, 84-5196.
 United States Court of Appeals,
District of Columbia Circuit.
 Aug. 23, 1985.
As Amended Aug. 23 and Aug. 30, 1985.
Rehearing En Banc Denied Oct. 11, 1985.
 
 Seth P. Waxman and Stephen L. Nightingale, Washington, D.C., were on the motion for attorney fees.
 George T. Mobille and Robert W. Adams, Washington, D.C., were on the reply to motion for attorney fees.
 Before WALD, GINSBURG, and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 Dissenting opinion filed by Circuit Judge WALD.
 GINSBURG, Circuit Judge:
 
 
 1
 We here rule on a motion for attorney fees invoking section 35 of the Lanham Act, 15 U.S.C.A. Sec. 1117(a) (West Supp.1985). The provision in question, applicable to trademark infringement litigation, authorizes court-awarded fees "to the prevailing party" in cases found "exceptional." The attorney fees request was filed following our decision in Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant, 760 F.2d 312 (D.C.Cir.1985) (Noxell I ); in that decision, we ordered the district court to dismiss a trademark infringement action, pursuant to 28 U.S.C. Sec. 1406(a) (1982), because venue had been laid in the wrong district. Location of the action in the District of Columbia, we held in Noxell I, was "unreasonable," contrary to "established law," and, in view of the Supreme Court's definitive pronouncement in Leroy v. Great Western United Corp., 443 U.S. 173, 185, 99 S.Ct. 2710, 2717, 61 L.Ed.2d 464 (1979), unsupported by "even a wisp" of tenable argument. 760 F.2d at 313, 317. We now grant the attorney fees application in the amount requested.
 
 I. BACKGROUND
 
 2
 To explain why we regard this case as "exceptional" and the fee applicants as "prevailing parties," we first recapitulate Noxell I.
 
 
 3
 Noxell Corporation (Noxell), incorporated in Maryland, is a food, cosmetics, and household-products conglomerate. Together with its wholly-owned Texas subsidiary, Caliente Chili, Inc. (Caliente), Noxell commenced a trademark infringement action in the District Court for the District of Columbia against two defendants: Firehouse No. 1 Bar-B-Que Restaurant (Firehouse) and its sole proprietor, Carl T. English, Jr., a full-time San Francisco firefighter. The Firehouse enterprise consisted of two modest barbeque restaurants, both in San Francisco; in addition, Firehouse markets one product, a barbeque sauce derived from a recipe of English's grandparents. Noxell charged that Firehouse's use of ALARM terms at the bottom portion of Firehouse labels to denote the "hotness" of the barbeque infringed upon Caliente's registered ALARM marks placed conspicuously on chili mixes and other spicy products marketed by Caliente.
 
 
 4
 Firehouse, we observed,
 
 
 5
 has no office or employees outside the San Francisco area. At the time Noxell lodged its complaint [in the District of Columbia], no more than 200 cases of Firehouse's product had been sold in the District. This number of cases amounted to less than 1.5% of Firehouse's total barbeque sauce sales. By contrast, 40% of Firehouse's total barbeque sauce sales occur in California.
 
 
 6
 Noxell I, 760 F.2d at 314.
 
 
 7
 Less than a month after Noxell filed the trademark infringement complaint, Firehouse (and its proprietor, firefighter English) moved to dismiss the action or to transfer it (pursuant to 28 U.S.C. Sec. 1406(a) (wrong venue--dismissal or transfer) or, alternatively, 28 U.S.C. Sec. 1404(a) (inconvenient forum--transfer)) to the Northern District of California. Promising an opinion that never followed, the district court issued a spare order denying the motion. After rejecting Firehouse's venue objection, the district court heard and then denied Noxell's motion for a preliminary injunction. Noxell appealed from the denial of its preliminary injunction motion, and Firehouse challenged by cross appeal the district court's unexplained rejection of Firehouse's objection to venue in the District of Columbia.
 
 
 8
 Noxell argued first that the venue ruling was not appealable. Although tendering an extra, unauthorized brief on the point, see Noxell I, 760 F.2d at 315 n. 5, Noxell overlooked the dispositive decision in this circuit, Lee v. Ply*Gem Industries, Inc., 593 F.2d 1266, 1270 (D.C.Cir.), cert. denied, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). We found Noxell's endeavor to stop the cross appeal wholly unworthy--lacking support "in statute law, this circuit's decisions, or good sense." Noxell I, 760 F.2d at 315.
 
 
 9
 Turning to the merits of Firehouse's venue objection, we found Noxell's presentation "remarkable," id. at 316, because it was totally at odds with the Supreme Court's unambiguous instruction in Leroy v. Great Western United Corp., supra. Defendants' San Francisco residence meant that the action could be maintained in the District of Columbia only if "the claim arose" here within the meaning of 28 U.S.C. Sec. 1391(b). Leroy crisply explained that the "claim arose" language, in cases of the kind brought by Noxell, must be interpreted with a view to the convenience of defendants (not plaintiffs):
 
 
 10
 [I]t is absolutely clear that Congress did not intend to provide for venue at the residence of the plaintiff or to give that party an unfettered choice among a host of different districts.... In our view, ... the broadest interpretation of the ["claim arose"] language of Sec. 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility--in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but not of the plaintiff)--may be assigned as the locus of the claim.
 
 
 11
 443 U.S. at 185, 99 S.Ct. at 2717.
 
 In light of Leroy, we determined:
 
 12
 Noxell has chosen the District of Columbia simply to suit its own convenience. The forum Noxell has selected is barely plausible in terms of the accessibility of relevant evidence; certainly the District of Columbia is a far less plausible choice from that vantage point than is the Northern District of California. While trial in the District of Columbia would serve plaintiffs' convenience, it would in no way serve the convenience of the defendants.
 
 
 13
 Noxell I, 760 F.2d at 317. We found it "inescapable" that "the District of Columbia may not be assigned as the locus of the claim in this case." Id. "Because we regard[ed] Noxell's attempt to lay venue in the District of Columbia as unreasonable, we d[id] not find it 'in the interest of justice' to order a transfer." Id. (quoting 28 U.S.C. Sec. 1406(a)). Instead, we vacated the order denying Noxell's preliminary-injunction motion and remanded the case to the district court with instructions to dismiss the action because Noxell had so unjustifiably laid venue in the wrong district. Id.[1]
 
 II. ATTORNEY FEES
 
 14
 Section 35 of the Lanham Act provides in relevant part: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C.A. Sec. 1117(a) (West Supp.1985). Firehouse's application presents the question whether an appellate court may award fees under this section to a litigant who demonstrates that the trademark infringement action instituted against him warrants dismissal on the ground that plaintiff's venue selection was improper and unreasonably imposed hardship on the fee applicant. Noxell I, 760 F.2d at 317. We answer yes.
 
 
 15
 Congress had two classes of litigants in mind when it enacted the fee provision of section 35. First, the legislature envisioned "make whole" compensation for certain victims of infringement; second, Congress endeavored to afford protection to defendants "against unfounded suits brought by trademark owners for harassment and the like." S.REP. NO. 1400, 93d Cong., 2d Sess. 5, 6 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7132, 7136.
 
 
 16
 Noxell interposes no challenge to the reasonableness of the hourly rates or the hours expended on the litigation as detailed by Firehouse. Instead, Noxell assails the fee request in four respects. Noxell first asserts that Firehouse, because it achieved dismissal of the action on a procedural ground not preclusive of a second action elsewhere, fails to qualify as a "prevailing party." Further, Noxell maintains that this case is not "exceptional." Additionally, Noxell contends that if fees are not denied to Firehouse here and now, the matter should be remitted to the district court for initial consideration; and that, in any event, no recovery should be allowed for time Firehouse spent resisting Noxell's effort to obtain a preliminary injunction. We address and reject each of these protests.
 
 A.
 
 17
 In rejecting Noxell's argument that a defendant qualifies as a "prevailing party" within the compass of section 35 of the Lanham Act only when he obtains a judgment on the merits, we align our court with the position taken by the Ninth Circuit under a Copyright Act provision for attorney fees. In Corcoran v. Columbia Broadcasting System, 121 F.2d 575 (9th Cir.1941), the Ninth Circuit considered defendants "prevailing parties" entitled to a fee award when their successful motion for a more definite statement led to a voluntary dismissal by the plaintiff:
 
 
 18
 [Plaintiff] claims that in view of his voluntary dismissal without prejudice, [defendants] were not "the prevailing party" within the meaning of the statute.... We think this is too narrow an interpretation of the statute. The authority given is not in terms limited to the allowance of fees to a party who prevails only after a trial on the merits. Where, as here, a defendant has been put to the expense of making an appearance and of obtaining an order for the clarification of the complaint, and the plaintiff then voluntarily dismisses without amending his pleading, the party sued is the prevailing party within the spirit and intent of the statute even though he may, at the whim of the plaintiff, again be sued on the same cause of action.
 
 
 19
 Id. at 576. The legislative history of the Equal Access to Justice Act, 28 U.S.C. Sec. 2412(b) (1982), indicates that the identical phrase "prevailing party" in that legislation "should not be limited to a victor only after entry of a final judgment following a full trial on the merits," but applies even "if the plaintiff has sought a voluntary dismissal of a groundless complaint." H.R.REP. 1418, 96th Cong., 2d Sess. 11 (1980). The House Report containing these statements bases them upon the expectation that the phrase in the new statute will be interpreted to be "consistent with the law that has developed under existing statutes," id., including specifically the Lanham Act provision here at issue, and specifically citing Corcoran.
 
 
 20
 We note that the situation of a defendant who achieves a dismissal short of an adjudication on the merits is unlike that of a plaintiff who wins an interlocutory ruling allowing litigation to continue. Hanrahan v. Hampton, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam), involved the latter situation. In Hanrahan, the Supreme Court held that plaintiffs who succeeded on appeal in overturning directed verdicts "were not ... 'prevailing' parties in the sense intended by 42 U.S.C. Sec. 1988." Id. at 756, 100 S.Ct. at 1988. "As a practical matter," the Court reasoned, the plaintiffs were "in a position no different from that they would have occupied if they had simply defeated the defendants' motion for a directed verdict in the trial court.... If the jury should [decide against the plaintiffs] on remand ..., it could not seriously be contended that the [plaintiffs] had prevailed." Id. at 758-59, 100 S.Ct. at 1989-90. See also Grubbs v. Butz, 548 F.2d 973, 976 (D.C.Cir.1976) (holding that Title VII plaintiff who successfully appealed dismissal for failure to exhaust administrative remedies was not a "prevailing party"; "[f]or all we know, the defendants in this case may be entirely blameless").
 
 
 21
 In contrast to a plaintiff who establishes only a right to proceed further, defendant Firehouse has here achieved an enduring victory. Noxell's suit stands dismissed, and Noxell is forever barred from reinstituting the action in the District of Columbia.
 
 
 22
 Congress intended to authorize fees for defendants subjected to "harassment" by trademark owners. See S.REP. NO. 1400, 93d Cong., 2d Sess. 6 (1974). We are persuaded that Firehouse and its proprietor English, haled before a court some 3000 miles from the place of their activity, have encountered "harassment" of the kind Congress meant to deter and that, in obtaining dismissal of the proceeding in the distant forum, Firehouse and English qualify as "prevailing parties" under the Lanham Act fee award provision.
 
 B.
 
 23
 Congress did not essay in the Lanham Act's text or related commentary precise definition of cases qualifying as "exceptional" for fee award purposes. The barely two pages of legislative history in point indicate, with respect to recovery of fees by defendants, a concern to discourage suits designed to harass. See supra p. 525. Furthermore, we think it fair to assume that Congress did not intend rigidly to limit recovery of fees by a defendant to the rare case in which a court finds that the plaintiff "acted in bad faith, vexatiously, wantonly, or for oppressive reasons"; that exception to the "American rule," the Supreme Court has clarified, is always available unless Congress expressly forbids its operation. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 258-59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). Something less than "bad faith," we believe, suffices to mark a case as "exceptional." Cf. Hodge Chile Co. v. KNA Food Distributors, 575 F.Supp. 210, 214 (E.D.Mo.1983) (fees awardable to defendant under 15 U.S.C. Sec. 1117(a) when plaintiff's action is unreasonable or pursued in bad faith), aff'd, 741 F.2d 1086 (8th Cir.1984).
 
 
 24
 The dissent appears to recognize, albeit haltingly, that the terse legislative history of the Lanham Act's fee provision is ambivalent on the point. Nonetheless, the dissent divines that Congress really wanted to do no more (on second thought, perhaps "marginally" more) than disapprove Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), and thereby restore the bad faith exception to the American rule in trademark cases. Dissent at 529 & n. 1. While the legislative history, thin as it is, supplies no clearly right answer to the question at hand, we do not find in its brief compass warrant for the severe constraint the dissent would impose. In our judgment, when Congress "limit[ed] attorney fees to 'exceptional case' and [placed] the award of attorney fees ... within the discretion of the court," S.REP. NO. 1400, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, p. 7136, the legislature did not intend to harness judges to a "hardly ever" rule.[2] Instead of the niggardly reading the dissent proffers (only "overt bad faith," possibly a smidgen less, Dissent at 529 n. 1), we think "exceptional," as Congress used the word in section 35 of the Lanham Act, is most reasonably read to mean what the word is generally understood to indicate--uncommon, not run-of-the-mill. On that familiar construction, we regard as "exceptional" Noxell's decision to locate in the District of Columbia its suit against San Francisco firefighter English and the fledgling San Francisco barbeque business English organized and operated.
 
 
 25
 We find in this case more than a hint of "economic coercion," see Comidas Exquisitos, Inc. v. Carlos McGee's Mexican Cafe, Inc., 602 F.Supp. 191, 199 (S.D.Iowa 1985), in Noxell's choice of a distant forum and its mode of proceeding. As earlier recounted, see supra p. 523, Noxell, in groundless argument, sought to block our consideration of the venue question. We do not know what motive occasioned its failure to cite and address in its briefs Lee v. Ply*Gem Industries, Inc., supra, the controlling decision of this court on appealability, see Noxell I, 760 F.2d at 315 n. 5; but "none that [is] laudable come[s] readily to mind." Viola Sportswear, Inc. v. Mimun, 574 F.Supp. 619, 621 (E.D.N.Y.1983) (awarding attorney fees and intimating, inter alia, that plaintiff's initial lodging of trademark infringement action in Texas was indefensible). Most critically, we observed in Noxell I that litigating in the District of Columbia entailed not merely inconvenience but hardship for firefighter English and his barbeque business. 760 F.2d at 317.
 
 
 26
 We think it altogether "exceptional," indeed, we called it "remarkable," id. at 316, for Noxell to launch litigation against Firehouse and English at a place far removed from California when a Supreme Court decision precisely in point, Leroy v. Great Western United Corp., supra, plainly declared the impropriety of that course. See supra pp. 523-524.
 
 
 27
 In response, Noxell cites a post-Leroy decision as justifying its action. Gold Eagle Co. v. Li, 486 F.Supp. 201 (N.D.Ill.1980), Noxell asserts, upheld venue on facts indistinguishable from those present here. But that district court disposition was apparently made in ignorance of Leroy. Gold Eagle does not cite Leroy and thus cannot be reckoned an application of, much less a substitute for, the Supreme Court's pronouncement.[3]
 
 
 28
 In sum, we are fully satisfied that Noxell brought to the District of Columbia an "exceptional" case.
 
 C.
 
 29
 A prevailing plaintiff may not obtain fees for work on claims unrelated to those on which the plaintiff prevailed. Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); Laffey v. Northwest Airlines, Inc., 746 F.2d 4, 27 (D.C.Cir.1984). Noxell urges that we apply this precedent to exclude fees attributable to Firehouse's defense against the trademark infringement charge on the merits. But it was Noxell's institution of litigation in the District of Columbia and its motion for a preliminary injunction that compelled Firehouse to defend on the merits. Moreover, to the extent that the merits were considered in the district court, Firehouse was the victor. We vacated the ruling on the preliminary injunction motion not because we found merit in Noxell's claim, but because we determined Firehouse house should not have been put to the burden of defending against the complaint in the District. Under the circumstances, we think it appropriate to award fees covering the full burden Noxell imposed on Firehouse.
 
 
 30
 We distinguish the case at hand from GAF Corp. v. Transamerica Insurance Co., 665 F.2d 364 (D.C.Cir.1981), in which it was clear that part of the litigation expense incurred in District proceedings yielded work product that would be useful in ongoing litigation elsewhere. Id. at 369; see also McLaughlin v. Cheshire, 676 F.2d 855, 857 (D.C.Cir.1982) (per curiam). Noxell has not informed us of any renewal of the infringement charge against Firehouse. Moreover, even if Noxell refiles the suit in the forum that can most plausibly be assigned as the locus of the claim--the Northern District of California--much of the work relating to the merits undertaken in the District of Columbia would provide scant, if any, assistance, for it involved gathering and rebutting testimony of District of Columbia shopkeepers on the issue of "confusion." See, e.g., Noxell I, 760 F.2d at 317; Brief for Defendants-Appellees/Cross-Appellants at 15-16, Noxell I. A case presented in the California forum would not center on grocers in the District of Columbia who had received, at most, 200 cases of Firehouse's product. Instead, evidence relating to the core market for the Firehouse barbeque would be readily at hand.
 
 
 31
 Noxell also questioned the propriety of awarding compensation for time spent in preparing the fee petition. But that matter is settled in this circuit. Hours reasonably devoted to a request for fees are compensable. See, e.g., Sierra Club v. EPA, 769 F.2d 796, 811, (D.C.Cir.1985); Laffey, 746 F.2d at 29.
 
 
 32
 Finally, there is no reason to remit the request for fees to the district court, thereby precipitating "a second major litigation." Hensley, 463 U.S. at 437, 103 S.Ct. at 1941. The full course of the litigation is immediately within our view. Noxell has not contested the reasonableness of the attorney hours Firehouse claimed or the rates charged. See supra p. 524. Thus, we need not enlist the district court's considerable expertise on that subject. Under the circumstances of this case, Firehouse's fee petition was appropriately addressed to our court, and we therefore act upon it. See, e.g., Moten v. Bricklayers, Masons & Plasterers International Union, 543 F.2d 224, 239-40 (D.C.Cir.1976).
 
 CONCLUSION
 
 33
 Firehouse and English are the prevailing parties in an exceptional case under the Lanham Act. We grant their reasonable request for attorney fees of $34,157.87.
 
 
 34
 It is so ordered.
 
 WALD, Circuit Judge, dissenting:
 
 35
 In Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant, 760 F.2d 312 (D.C.Cir.1985) (Noxell I ), we held that Noxell Corporation (Noxell) could not lay venue for its trademark infringement action against Firehouse No. 1 Bar-B-Que Restaurant (Firehouse) in the District of Columbia. That decision was correct. Today, however, the panel holds that Noxell's position, which the district court accepted, was so entirely indefensible that Firehouse should recover attorneys' fees under the Lanham Act. Because I believe the majority misapprehends the Lanham Act, fails to acknowledge the divergent strands in venue law that misled Noxell, and speculates without adequate support about Noxell's motives in bringing and prosecuting its suit, I respectfully dissent.
 
 
 36
 * In Aladdin Manufacturing Co. v. Mantle Lamp Co. of America, 116 F.2d 708 (7th Cir.1941), the court of appeals held that because the defendant's trademark infringement and unfair competition had been "fraudulent and wilful," id. at 717, the plaintiff was entitled to an award of attorneys' fees. Although Aladdin was decided before passage of the Lanham Act of in 1946, the lower federal courts generally followed its approach in cases brought under the Act by awarding attorneys' fees to victims of trademark infringement only if the violator's conduct was fraudulent or at the very least utterly without justification. See, e.g., Baker v. Simmons Co., 325 F.2d 580, 583 (1st Cir.1963) (fees available in cases of "fraud and palming-off"); Wolfe v. National Lead Co., 272 F.2d 867, 873 (9th Cir.1959) ("deliberate and fraudulent" infringement), cert. denied, 362 U.S. 950, 80 S.Ct. 860, 4 L.Ed.2d 868 (1960); Century Distilling Co. v. Continental Distilling Corp., 205 F.2d 140, 149 (3d Cir.) ("showing of fraud"), cert. denied, 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400 (1953). Where a plaintiff's decision to bring an infringement action or its conduct of the action was thought blameworthy in the same way as fraudulent infringement, courts asserted that they could award attorneys' fees to defendants. Such awards were, however, extremely rare.
 
 
 37
 In General Motors Corp. v. Cadillac Marine & Boat Co., 226 F.Supp. 716 (W.D.Mich.1964), for example, General Motors brought an action seeking to enjoin a small manufacturer from using the word "Cadillac" to describe its boats, although General Motors did not make boats and sixty-four active Michigan corporations used "Cadillac" as the first word in their names. See id. at 720, 723. The court condemned General Motors for "reach[ing] out its strong, choking, monopolistic hand to strangulate industries or free enterprises located within the City of Cadillac, Michigan." Id. at 741. The court found that General Motors had brought its nonmeritorious action "out of reach of a much earlier and much less expensive action in the Patent Office to seek a highly similar result in the Federal District Court," id. at 744, and that "the purpose of such a removal ... was ... to place such an economic burden upon the defendant, a small corporation of limited assets, that it would be forced to yield to the unjust demands of the plaintiff," id. For these reasons, attorneys' fees were awarded. See also John R. Thompson Co. v. Holloway, 366 F.2d 108, 116 & n. 15 (5th Cir.1966) (rejecting fee request by defendant); Riverbank Labs. v. Hardwood Prods. Corp., 165 F.Supp. 747, 765 (N.D.Ill.1958) (same).
 
 
 38
 In 1967, however, the Supreme Court overturned these cases by holding that the courts were without any power at all to award attorneys' fees in cases brought under the Lanham Act. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Congress disapproved Fleischmann by amending section 35 of the Lanham Act to provide for awards of reasonable attorneys' fees in "exceptional cases" under the Act to the "prevailing party." Act of Jan. 2, 1975, Pub.L. No. 93-600, Sec. 3, 88 Stat. 1955, 1955 (current version codified at 15 U.S.C.A. Sec. 1117(a) (West Supp.1985)). The majority speculates that because the American rule always permits attorneys' fees if a party acts in bad faith unless Congress declares otherwise, Congress must have intended that something less than bad faith would suffice under section 35. See Maj.Op. at 526. But after Fleischmann, Congress could not possibly have assumed that the bad faith exception was available in Lanham Act cases without further legislation. To the contrary, Congress knew it had to act if attorneys' fees were ever to be available even in cases of bad faith under the Lanham Act, as the legislative history clearly shows.[1]
 
 
 39
 The Senate Report on the Lanham Act amendment confirms that Congress did not intend any significant enlargement of the narrow exception that allowed attorneys' fees in some infringement actions that generally prevailed before Fleischmann. The report specifically criticized Fleischmann, see S.Rep. No. 1400, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, p. 7136, and observed that "[d]eliberate and flagrant infringement of trademarks should be particularly discouraged," id. The report consequently declared that:
 
 
 40
 The Department of Commerce believes and the Committee agrees that [attorneys' fees] should be available in exceptional cases, i.e., in infringement cases where the acts of infringement can be characterized as "malicious," "fraudulent," "deliberate," or "willful." The attorney fee remedy should coexist with [the] existing provision for treble damages and attorney fees should also be available to defendants in exceptional cases.
 
 
 41
 Id. at 523; see also id. at 524. The majority is thus mistaken to think that Congress did not define "exceptional" cases. This passage plainly limits exceptional cases to those involving malicious, fraudulent, deliberate or willful conduct. In addition, after defining "exceptional" cases in this restrictive way the report immediately notes, without any further comment on the meaning of "exceptional," that fees are also available to defendants in "exceptional cases." This reference confirms that the same definition of "exceptional" applies to plaintiffs and defendants, as one would have assumed anyway from considerations of basic fairness.[2] It is in light of this and similar passages from the legislative history, as well as the strict standard in cases decided before Fleischmann, that we should understand the later comment in the report that fees may be awarded to defendants if necessary to protect against "unfounded suits brought by trademark owners for harassment and the like." Id. at 524.[3]
 
 
 42
 Courts have adopted different verbal formulations to describe the meaning of "exceptional cases," but they are agreed that a very strong showing is required. For attorneys' fees to be awarded against an infringer, "the elements of bad faith or fraud must be present." Burger King Corp. v. Mason, 710 F.2d 1480, 1495 n. 11 (11th Cir.1983) (citations omitted), cert. denied, --- U.S. ----, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984); accord Safeway Stores, Inc. v. Safeway Discount Drugs, 675 F.2d 1160, 1169 (11th Cir.1982); Salton Inc. v. Cornwall Corp., 477 F.Supp. 975, 992 (D.N.J.1979); see also VIP Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1107 (10th Cir.1982). For a defendant to be awarded fees, the plaintiff must ordinarily have sued in a spirit akin to fraud. In Viola Sportswear, Inc. v. Mimun, 574 F.Supp. 619 (E.D.N.Y.1983), cited by the majority, see Maj.Op. at 527, the plaintiff corporation brought an action charging a nationwide conspiracy to infringe its trademarks upon discovering that the defendants had sold a single pair of blue jeans, which might or might not have constituted an act of infringement depending on facts the plaintiff did not trouble to investigate before suing. See id. at 619-20. During discovery, it became "clear beyond cavil, if it had not been before, that the plaintiff's claim was without any basis in fact," id. at 620, but the plaintiff refused to discontinue suit unless the defendants released it from all liability for bringing the action. Id. at 620. On these extreme facts, the court awarded attorneys' fees. Cases decided under the parallel provision in the patent laws allowing for attorneys' fees in exceptional cases, see 35 U.S.C. Sec. 285, impose similarly stringent requirements. See, e.g., Loctite Corp. v. FelPro, Inc., 667 F.2d 577, 584 (7th Cir.1981) (awards reserved for cases of "willful misconduct or bad faith") (citation omitted); Smith v. ACME General Corp., 614 F.2d 1086, 1095 (6th Cir.1980) ("unfairness, bad faith, inequitable or unconscionable conduct"); Maurice A. Garbell, Inc. v. Boeing Co., 546 F.2d 297, 300 (9th Cir.1976) ("bad faith or unequitable conduct ... which would make it grossly unjust for the prevailing party to be left with the burden of his litigation expenses") (citations omitted), cert. denied, 431 U.S. 955, 97 S.Ct. 2677, 53 L.Ed.2d 272 (1977). See generally 2 S. Speiser, Attorneys' Fees Sec. 14.51 (1973 & Nov. 1984 Supp.).
 
 
 43
 These cases do not support an award of attorneys' fees merely upon a showing of incorrect or careless judgment. Fairly read, they permit fee awards only if a litigant acts in bad faith or asserts claims so frivolous that the litigant could not have had a bona fide belief in their merit.[4] I think it clear that Noxell's conduct of this litigation did not descend to that level.
 
 II
 
 44
 The majority holds that Firehouse is a prevailing party under the Lanham Act, although its victory was entirely on procedural grounds. It then declares that this case is "exceptional" for several reasons. In its view, Noxell presented unreasonable arguments on the venue question; unjustifiably claimed that we lacked appellate jurisdiction to resolve the venue question and failed to cite our previous decision holding to the contrary; and was guilty of economic harassment. I am willing to assume that a litigant who obtains a final judgment on procedural grounds, even one that allows the action on the merits to be brought again, may have prevailed under section 35. However, for the reasons stated below I think the procedural character of Firehouse's success should make us extremely reluctant to call the case exceptional.
 
 
 45
 In denying a preliminary injunction, the district court held that Noxell failed to show a substantial likelihood of success on the merits. See Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant, No. 83-3087 (D.D.C. Mar. 6, 1984). But as the district court's opinion plainly shows, Noxell's underlying claim of infringement is not remotely frivolous.[5] The district court found a substantial likelihood that Noxell's marks FALSE ALARM, 1-ALARM, 2-ALARM, and 3-ALARM were validly registered, see id. at 526, and that the marks were sufficiently distinctive when used to describe the spiciness of food so as to be entitled to protection against infringement, see id. at 526. Although the district court believed that Noxell could probably not establish at trial a substantial likelihood of confusion among consumers, the court's discussion of the issue reveals it to be a serious one. See id. at 526-528. This, then, is plainly not an "unfounded suit[ ] brought by [a] trademark owner[ ] for harassment and the like," S.Rep. No. 1400, 93d Cong., 2d Sess. 6 (1974), U.S.Code Cong. & Admin.News 1974, p. 7136 (emphasis added). Indeed, with the case in its present posture we cannot even say that Noxell does not have a winning case on the merits.
 
 
 46
 This fact is obviously an embarrassment under a statute that provides for awards of attorneys' fees only to prevailing parties. Corcoran v. Columbia Broadcasting System, 121 F.2d 575 (9th Cir.1941) (discussed in Maj.Op. at 524-525), is not dispositive, since there, as the court of appeals carefully noted, the district court awarded attorneys' fees only after it expressly found that the suit was filed " 'without justification, either in law or in fact.' " Id. at 576. The case thus does not establish that a defendant prevails by achieving dismissal on procedural grounds of a possibly meritorious action, especially when, as here, the decision to dismiss the action instead of transfer it was discretionary.[6] The House Report on the Equal Access to Justice Act, Pub.L. No. 96-481, tit. II, 94 Stat. 2325 (1980), amended by Act of Aug. 5, 1985, Pub.L. No. 99-80, 99 Stat. 183 (current version to be codified at 5 U.S.C. Sec. 504 and 28 U.S.C. Sec. 2412), emphasizes this limitation on Corcoran by citing the case for the proposition that a defendant prevails "if the plaintiff has sought a voluntary dismissal of a groundless complaint." H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11 (1980) (emphasis added). No court has yet found that Noxell's charge of infringement is groundless.
 
 
 47
 Nonetheless, the fundamental purpose of the attorneys' fees amendment to the Lanham Act was to preserve the equitable powers the lower federal courts exercised before Fleischmann. I thus assume that those powers were broad enough, and that the wording of the statute is flexible enough, to allow awards of attorneys' fees to some litigants who achieve favorable final judgments based on procedural issues, even if a new action on the merits could be brought and might succeed.[7] But as the legislative history shows, litigants in such cases are not those Congress particularly wanted to protect by allowing fee awards, and we ought to approach applications for fees in such cases quite cautiously.
 
 
 48
 This reticence is especially appropriate when the main ground of objection is a plaintiff's improper choice of venue. A court may transfer or dismiss an action brought in the wrong district, and if the case is merely transferred to a proper district there is considerable doubt that the litigant who obtained transfer would be a prevailing party under the Lanham Act. Cf. Hanrahan v. Hampton, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam); McGill v. Secretary of Health & Human Servs., 712 F.2d 28, 30-32 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984). And if such a litigant is not prevailing, the availability of statutory attorneys' fees to deter a plaintiff's improper venue choice depends upon whether the court dismisses or transfers--a determination which rests in the broad discretion of the court and which may be based on factors wholly unrelated to the blameworthiness of the plaintiff's conduct. For that reason, we should not award attorneys' fees in cases dismissed for improper venue unless the plaintiff's conduct was so egregious as to have made dismissal rather than transfer the only conceivable choice, regardless of any other factors that might have favored transfer.[8] This is not such a case.
 
 
 49
 Yet another consideration counseling restraint here is the principle that "[t]he purpose of [the provision for attorneys' fees in exceptional cases] is not to discipline uncooperative counsel or counsel who is overzealous in the advocacy of his client's claims." Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp., 407 F.2d 288, 297 (9th Cir.1969) (citation omitted). For that reason, the Monolith court specifically disapproved the district court's reliance on counsel's litigation conduct in a patent case, rather than behavior realistically attributable to the litigant, in determining that a case was "exceptional." Accord Kaehni v. Diffraction Co., 342 F.Supp. 523, 537 (D.Md.1972), aff'd mem., 473 F.2d 908 (4th Cir.), cert. denied, 414 U.S. 854, 94 S.Ct. 151, 38 L.Ed.2d 103 (1973); cf. Stillman v. Edmund Scientific Co., 522 F.2d 798, 800-01 & nn. 2, 4 (4th Cir.1975) (approving Monolith and Kaehni on this point). The decision to sue in a particular venue is much more likely to be attributable to counsel than to a litigant, particularly when, as here, a defendant has some connection with the forum and the forum choice is thus not entirely unreasonable and harassing on its face to a nonlawyer. The federal courts have other devices to control litigation conduct by lawyers that strays completely out of bounds, see 28 U.S.C. Sec. 1927; Fed.R.Civ.P. 11, 26(g), 37; Fed.R.App.P. 46(c), and there is little reason to suppose that section 35 was intended to give the federal courts greater control over borderline conduct by counsel in trademark actions than they possess in other cases. Cf. Roadway Express, Inc. v. Piper, 447 U.S. 752, 763, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980) ("There is no persuasive justification for subjecting lawyers in different areas of practice to differing sanctions for dilatory conduct.")
 
 III
 
 50
 I turn next to the question of whether Noxell's venue arguments, which the dis trict court accepted, were entirely or outrageously unjustified. We held that they were wrong, but I do not believe they were totally unsupported or patently irrational.
 
 
 51
 Noxell's major venue argument was that its claims "arose" in the District of Columbia within the meaning of 28 U.S.C. Sec. 1391(b). Firehouse shipped roughly 200 cases of barbeque sauce, amounting to about 1.5% of Firehouse's total barbeque sauce sales, to grocers in the District of Columbia. See Noxell I, 760 F.2d at 314, 317. Carl English, Jr., the proprietor of Firehouse, attended a four-day trade show in the District of Columbia, at which he sold barbeque sauce and distributed advertising material. As part of English's efforts to publicize Firehouse products, he spoke with a reporter from the Baltimore Sun at the show, who wrote a story in which English was quoted. See Baltimore Sun, July 3, 1983 at H1, H5, col. 1. Firehouse has advertised its barbeque sauce in national trade journals and in the New York Times, which is widely distributed in the District of Columbia. Noxell argued that the wrongful sale of Firehouse's allegedly infringing product in the District, coupled with Firehouse's other contacts here, satisfied section 1391(b).
 
 
 52
 Before the Supreme Court authoritatively construed the "where the claim arose" provision of section 1391(b) in Leroy v. Great Western United Corp., 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the leading trademark case in the courts of appeals on this provision was probably Tefal, S.A. v. Products International Company, 529 F.2d 495 (3d Cir.1976). In Tefal, a trademark holder and its licensee brought suit against an alleged infringer based in California. The alleged infringer's sales in New Jersey, where the suit was brought, accounted for about 5 percent of its national sales; its sales in California were apparently much greater. The plaintiff licensee, however, was incorporated in New Jersey. In finding that the claim arose in New Jersey, the court of appeals remarked that "[i]f we assume the applicability and soundness of the 'more than minuscule' test of Honda Associates, Inc. v. Nozawa Trading, Inc., 374 F.Supp. 886 (S.D.N.Y.1974) ... that test has been more than satisfied on this record."[9] Tefal, 529 F.2d at 497. Tefal thus suggested that if an alleged infringer had more than miniscule contacts with a jurisdiction in which the allegedly infringing product was sold, an action under the Lanham Act arose in the jurisdiction. Perhaps because trademark actions characteristically involve many discrete sales of allegedly infringing products and because the sale of those infringing products is often spread evenly over a number of jurisdictions, the Tefal approach gathered considerable support in district court cases. See, e.g., Factors Etc., Inc. v. Creative Card Co., 444 F.Supp. 279, 286-88 (S.D.N.Y.1977), aff'd sub nom. Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215 (2d Cir.1978), cert. denied, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); cf. Lamont v. Haig, 590 F.2d 1124, 1134 & n. 64 (D.C.Cir.1978) (citing Tefal with approval). Under these cases, Noxell had a nonfrivolous claim that it could sue Firehouse in the District of Columbia.
 
 
 53
 For the reasons we explained in Noxell I, the "more than miniscule" test is not an appropriate standard for venue in trademark actions after Leroy. But Leroy was not a trademark case. Even after Leroy, courts understandably sometimes addressed venue problems in trademark cases by looking to venue precedents discussing similar facts, without fully considering whether those familiar cases were consistent with intervening Supreme Court precedent. In this case, Noxell particularly relied on Gold Eagle Co. v. Li, 486 F.Supp. 201 (N.D.Ill.1980), decided after Leroy, in which the court held that Illinois sales amounting to less than 1.5 percent of total sales, coupled with a manufacturer's circulation of advertising materials and participation at a trade show in Illinois, supported venue in that state. The court commented that the alleged infringer had "more than 'miniscule contact' " with the forum, id. at 203, and that its activities amounted to "more than a 'mere vestige of venue,' " id. (citations omitted). It is true that Gold Eagle did not cite Leroy, but Gold Eagle may have contributed to Noxell's doubts, however poorly thought through, that Leroy would not carry over fully to trademark cases. Moreover, Gold Eagle was hardly alone in its incautious use of language that Leroy rendered vulnerable. See Mida Mfg. Co. v. Femic, Inc., 539 F.Supp. 159, 163-64 (E.D.Pa.1982) (Third Circuit requires "substantial business" in forum for venue; "it appears the Third Circuit has approved the conclusion ... that defendants must conduct more than miniscule business in the jurisdiction") (citations omitted); Parliament Import Co. v. Gibson Wine Co., 537 F.Supp. 72, 74 (E.D.Pa.1982) (contacts "are not miniscule"); Chicago Reader, Inc. v. Metro College Publishing, Inc., 495 F.Supp. 441, 443 (N.D.Ill.1980) (contacts are " 'more than miniscule' " and "constitute more than a 'mere vestige of venue' ") (citations omitted); Heritage House Frame & Moulding Co. v. Boyce Highlands Furniture Co., 88 F.R.D. 172, 173 (E.D.N.Y.1980) ("more than miniscule"); Bastille Properties, Inc. v. Hometels of Am., Inc., 476 F.Supp. 175, 180 & n. 4 (S.D.N.Y.1979) (contract action) ("the existence of long arm jurisdiction based on defendants' transaction of business within New York is, without more, sufficient to support a finding that the claim arose in New York") (citation omitted) (discussing Leroy in footnote); cf. Pfeiffer v. International Academy of Biomagnetic Medicine, 521 F.Supp. 1331, 1343 (W.D.Mo.1981) ("This Court is not alone in its frustration and confusion over what standard should be applied for determining where a claim arose under the federal venue statutes since the Leroy decision.").[10] Without endorsing or criticizing the results and factual analysis in these cases, I think it fair to say that some courts tended after Leroy to treat actions for trademark infringement as special for purposes of venue. In light of those cases, I cannot find that Noxell's arguments represented unconscionable behavior.
 
 
 54
 At oral argument, Noxell suggested an alternative theory of venue on which it had not previously focused. Noxell's complaint had asserted without elaboration that venue was proper under 28 U.S.C. Sec. 1391, which provides that for certain actions, this one among them, venue is proper in the district where all defendants reside. As a corporation, Firehouse resides for venue purposes "in any judicial district in which it ... is doing business." 28 U.S.C. Sec. 1391(c). Noxell claimed that by selling 200 cases of its sauce in the District of Columbia, Firehouse had done business here and venue was therefore proper.
 
 
 55
 The most obvious problem with this argument was that Noxell also sued Carl English, Jr., the proprietor of Firehouse, who is plainly not a resident of the District of Columbia. But the main defendant in this action was Firehouse. Had venue been proper against it, there would have been a real argument for conditioning any dismissal on Noxell's refusal to drop English as a defendant. Cf. Anrig v. Ringsby United, 603 F.2d 1319, 1323-24 (9th Cir.1978).
 
 
 56
 We rejected Noxell's argument on the merits, citing Johnson Creative Arts, Inc. v. Wool Masters, Inc., 743 F.2d 947 (1st Cir.1984) for the conclusion that " ' "[D]oing business" in a district for purposes of Sec. 1391(c) [should be] read to mean engaging in transactions there to such an extent and of such a nature that the state in which the district is located could require the foreign corporation to qualify to "do business" there.' " Noxell I, 760 F.2d at 316 n. 7 (quoting Johnson Creative Arts, 743 F.2d at 954 (footnote omitted)) (emphasis in original). That disposition was correct, both for the reasons given in Johnson Creative Arts and the further reasons offered by the majority today. See Maj.Op. at 527 n. 3. However, Johnson Creative Arts had not yet been decided when this case was briefed on appeal, and in any event was not binding precedent on us. Other authorities have taken quite a different view:
 
 
 57
 [A]lthough the matter is not free from doubt, and there is very respectable contra authority, we believe that if a corporation is amenable to service of process it should be held to be 'doing business' for venue purposes. In the borderline situation, a court must look to the particular facts of each case and examine the nature of the corporation's contacts with the state, in relation to the suit that is being pressed against it. In the International Shoe case the Court said that a corporation is amenable to service of process, in a foreign state, if the corporation has 'certain minimum contacts with it [the state, so] that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' If it is not unfair to subject the corporation to the court's jurisdiction by service of process, it seems wise and not unfair to hold that there is a proper venue....
 
 
 58
 1 J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, Moore's Federal Practice p 0.142[5.-1-3] at 1411-13 (2d ed. 1985) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)) (footnotes omitted) [hereinafter cited as Moore's Federal Practice]; see also 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3811 at 65 (1976) ("There is much to be said for the view that if a corporation is doing enough business in a district to satisfy the constitutional tests on which it may be subjected to process there, that district should be a proper venue.") (footnote omitted). These authorities cite numerous cases for this view, see Moore's Federal Practice at 1411 n. 43 (2d ed. 1985 & Supp.1984-85); and while all the cases cited may not adopt the full sweep of the theory described in Moore's, some cases certainly do. See Combs Airways, Inc. v. Trans-Air Supply Co., 560 F.Supp. 865, 868-69 (D.Colo.1983); Neizil v. Williams, 543 F.Supp. 899, 904 (M.D.Fla.1982); Stith v. Manor Baking Co., 418 F.Supp. 150, 155 (W.D.Mo.1976). There is very good reason to assume that Noxell's suit against Firehouse could, consistently with the International Shoe test, have been brought in the District of Columbia. Noxell thus plainly had a thoroughly colorable claim that venue was proper in the District of Columbia against the principal defendant in the suit.[11]
 
 
 59
 In sum, Noxell eventually produced two theories of venue. The first, its theory of where the claim arose, was foreclosed by Leroy, but I cannot join in assessing attorneys' fees against Noxell for adhering to venue principles that one can plausibly read numerous district court cases after Leroy as adopting. Noxell's second theory, though it was tardily asserted and would have required dismissing a defendant, was arguably supported by diverse and respected authorities. Neither of these theories was so transparently frivolous as to call Noxell's good faith in question.
 
 IV
 
 60
 The majority also darkly hints that Noxell's motives in bringing this suit were unworthy. The majority suggests that this case involves "economic coercion," Maj.Op. at 526, but the precedents granting attorneys' fees on this ground all involved meritless claims brought in a malicious effort to grind down an opponent,[12] and nothing like that happened here. It would hardly have been rational for Noxell, if it had lacked a good-faith belief in its venue theories, to have sued in the District of Columbia, since Noxell could expect a really frivolous argument to be defeated in the district court at an early stage, before Firehouse was put to significant expense. Noxell undoubtedly chose to bring this action in the District of Columbia because this forum was the most convenient for it, see Noxell I, 760 F.2d at 317--not, so far as we can reasonably infer, in a calculated effort to strain the resources of Firehouse. Noxell was certainly indifferent to the inconvenience it was imposing on Firehouse. But if Noxell asserted, in good faith, a colorable claim that venue in the District of Columbia was proper, we should not punish it because another jurisdiction would have been much more convenient for its smaller and less affluent opponent.
 
 
 61
 Finally, the majority complains of Noxell's failure to cite our five-sentence discussion and holding in Lee v. Ply*Gem Industries, Inc., 593 F.2d 1266, 1270 (D.C.Cir.), cert. denied, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979), on the issue of appellate jurisdiction. Neither party cited the case to us, see Noxell I, 760 F.2d at 315 n. 5, although Noxell's counsel did recognize the case when it was cited from the bench at oral argument. In any event, whatever lapse occurred was plainly counsel's, not Noxell's, and for that reason I question whether it should have much weight in a ruling under section 35 of the Lanham Act. See supra at p. 528. In addition, the episode involved a deficiency in appellate presentation and would thus, even if truly major, be of tangential relevance to an award of fees for work before the district court as well as here.CONCLUSION
 
 
 62
 In Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 269, 95 S.Ct. 1612, 1627, 44 L.Ed.2d 141 (1975), the Supreme Court observed that the issue of when the federal courts should award attorneys' fees is "a policy matter Congress has reserved to itself." Id. at 269, 95 S.Ct. at 1627. As the fee statutes surveyed in Alyeska Pipeline make plain, we deal here with a particularly restrictive provision. See id. at 261, 95 S.Ct. at 1623. I do not believe that the result reached today is consistent with those restrictions.
 
 
 63
 In my view, all the cases awarding fees under the Lanham Act and the patent laws involve far more serious misconduct than Noxell's errors of judgment. As the district court's opinion shows, Noxell had a plausible claim that Firehouse was infringing its trademarks. After negotiating to see if resolution was possible, Noxell brought suit seeking injunctive relief in a forum convenient to itself where Firehouse was selling its allegedly infringing products. Although Noxell's venue argument was wrong under the Supreme Court's decision in Leroy, language in numerous district court cases decided since Leroy might be read to support Noxell's view. The district court, after considering briefs in which the relevant cases, including Leroy, were cited, agreed with Noxell.
 
 
 64
 Noxell may have been guilty of carelessness and blunders in this suit, but I believe section 35 of the Lanham Act requires considerably more to justify an award of attorneys' fees. I would deny the motion for fees.
 
 
 
 [1]
 The dissent, particularly in Part II, insists that a decision to dismiss, not transfer, is an act of "broad discretion," which "may be based on factors wholly unrelated to the blameworthiness of the plaintiff's conduct." Dissent at 534. But we could not have stated more plainly our reasons for finding it not "in the interest of justice" to transfer in Noxell I. We determined that Noxell's venue choice was not a decision reflecting mere "carelessness," a "lapse," or "blunders," see Dissent at 534 n. 8, 538, 539; we held the choice downright "unreasonable," inescapably spelling hardship for English and Firehouse. Noxell I, 760 F.2d at 317
 
 
 [2]
 While the Senate Report criticized the Supreme Court's Fleischmann decision, the Report never indicated that Congress meant to limit fee recovery to such extreme cases; the Report merely tells us that at least such cases should be covered. The dissent, moreover, indiscriminately reads language Congress used in relation to recovery by plaintiffs into the separate statement the Report makes regarding fees for defendants. We think the dissent homogenizes inappropriately the protections Congress separately stated for prosecuting parties, on the one hand, and defending parties, on the other. As the Senate Report suggested, the evil feared regarding plaintiffs was malicious infringement of plaintiffs' trademarks facilitated by the size of the national market. The Report's reference to "malicious" conduct thus indicated principally the infringement itself, not the mode of proceeding in court. On the defendants' side, however, the fear is litigation conduct--suits imposing hardship brought to harass, whether descending to the rock bottom rung of "bad faith" or not
 
 
 [3]
 The dissent, in Part III, finds support in a few other district court decisions that, like Gold Eagle, appeared to hold trademark plaintiffs to a lesser standard than the one unambiguously announced in Leroy. Leroy, however, indicates no exception for trademark cases, and none of the district court decisions the dissent cites attempts to reconcile the court's disposition with Leroy. We are puzzled, moreover, by the dissent's apparent belief that trademark actions are "special" because they "characteristically involve many discrete sales of allegedly infringing products" that are "often spread fairly evenly over a number of jurisdictions." Dissent at 535, 536. We can say with assurance that a very sizable portion of federal court civil litigation bears similar description, including the interstate sale of stock at issue in Leroy itself
 The dissent additionally raises "an alternative theory of venue" never tendered in Noxell's extensive briefing, but offered by Noxell at oral argument. Dissent at 536. Respected authority, the dissent suggests, might find the District of Columbia a place of proper venue for Firehouse under 28 U.S.C. Sec. 1391(c) (1982), because that small San Francisco enterprise can be said to be "doing business," and therefore to reside, here for venue purposes. That position, urged in this case as an afterthought, leads to a troublesome terminus; if embraced as a correct reading of Sec. 1391, it would mean that for corporations, venue based on residence through "doing business" would totally eclipse the limited reading the Supreme Court gave to the Sec. 1391(b) "claim arose" language in Leroy. At any event, we can detect no reason why Noxell would deliberately sue two defendants in the District of Columbia, only to turn around and ask to dismiss one, a "fallback" strategy the dissent attributes to Noxell so as to find this midnight-hour alternative theory reasonable. Dissent at 537 n. 11.
 
 
 [1]
 For purposes of this case, I am willing to assume that section 35 of the Lanham Act might give the courts marginally greater discretion to award fees than they possess under the American rule, as that rule is now understood. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). The argument for that position would hinge on the sentence in the Senate Report stating that "[t]rademark and unfair competition cases ... present a particularly compelling need for attorney fees, which are denied under the Fleischmann doctrine." S.Rep. No. 1400, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, p. 7136. One might conceivably read this sentence as suggesting that in some trademark and unfair competition actions, courts should be slightly more willing to award fees than in other cases. But the sentence could just as easily mean only that the reasons supporting any bad faith exception at all are especially strong in those cases, not that the scope of the exception should be any broader in them. The disparaging citation of Fleischmann in the sentence supports the latter reading by implying that the sentence simply states why Fleischmann was wrong to abolish the previously existing fraud or bad faith exception
 Thus, only a weak and highly disputable inference from a single sentence in the legislative history even arguably suggests that section 35 allows a fee award on any lower standard than bad faith. Against that tenuous inference are arrayed the explicit definition of "exceptional" quoted in the text (which appears twice in the Senate Report), the lengthy discussion of why Fleischmann was bad policy, the approving references to the lower court cases before Fleischmann, the total absence of even a hint that those lower court cases did not go far enough in awarding fees, and the report's emphasis on such adjectives as "deliberate" and "flagrant" to describe exceptional cases. The legislative history is "ambivalent," Maj.Op. at 526, only in that one may doubt whether courts are restricted to cases of bad faith or fraud, or whether unconscionable conduct not quite amounting to overt bad faith might be enough. In my view, the legislative history, when read against the cases to which Congress explicitly referred, precludes an award of fees in a case such as this one.
 
 
 [2]
 As the legislative history for the attorneys' fees amendments to section 35 plainly shows, Congress was chiefly concerned about the evils of trademark infringement--not the possibility of nonmeritorious suits charging infringement. Thus, the Senate Report discussed at some length why it thought that victims of infringement should be eligible for fee awards, and added as a brief afterthought with virtually no discussion that alleged infringers are also eligible for fees. See S.Rep. No. 1400, 93d Cong., 2d Sess. 2, 4-6 (1974). But despite Congress' preoccupation with preventing and punishing infringement, it allowed victims of infringement to recover fees only if the infringer had been malicious, fraudulent, deliberate, or willful. The majority upends the legislative history by suggesting that the standard for awards to alleged infringers like Firehouse, about whom Congress was not principally concerned, should be more permissive than the standard for awards to victims of infringement. See Maj.Op. at 526 n. 2. The majority may also mean to imply that the definition of "exceptional" in the legislative history related to substantive, pre-litigation conduct like infringement, rather than to litigation conduct like venue choice. But again, if Congress was mainly acting to prevent infringement and nonetheless decided, in effect, that only bad faith infringement could justify a fee award, no lower standard could plausibly govern fee awards for litigation misconduct
 The majority also seems to find support for its broad view of a court's authority to award fees in the passage from the Senate Report stating that the attorneys' fees amendment "would limit attorney fees to 'exceptional cases' and the award of attorney fees would be within the discretion of the court." S.Rep. No. 1400, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, p. 7136; see Maj.Op. at 526. In context, the reference to a court's "discretion" with respect to "the award" seems to me most naturally read as simply meaning that the court has discretion to fix the amount of the award. But even assuming that the sentence refers to the court's "discretion" in deciding whether to award any fees at all, the sentence must be read to mean that a court has discretion to refuse fee awards even in cases that might qualify as exceptional. See 15 U.S.C.A. Sec. 1117(a) (West Supp.1985) ("The court in exceptional cases may award reasonable attorney fees....") (emphasis added); cf. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 261-62, 95 S.Ct. 1612, 1623-24, 44 L.Ed.2d 141 (1975) (contrasting statutes containing mandatory attorneys' fees provisions with those containing discretionary provisions).
 
 
 [3]
 The history of the provision in the patent laws allowing for attorneys' fees in exceptional cases, which is generally construed in pari materia with section 35 of the Lanham Act, is similar. Under a rule dating from the nineteenth century, see Philp v. Nock, 84 U.S. (17 Wall.) 460, 21 L.Ed. 679 (1873); Teese v. Huntingdon, 64 U.S. (23 How.) 2, 8-9, 16 L.Ed. 479 (1860), recovery of attorneys' fees was flatly unavailable in patent actions. Congress overturned that rule in 1946, see Act of August 1, 1946, ch. 726, 60 Stat. 778, 778, to allow for fees to a prevailing party in the discretion of the court. The Senate Report commented that "[i]t is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits, but the discretion given the court in this respect ... will discourage infringement of a patent by anyone thinking that all he would be required to pay if he loses the suit would be a royalty. The provision is also made general [i.e., applicable to both alleged infringers and those charging infringement] so as to enable the court to prevent a gross injustice to an alleged infringer." S.Rep. No. 1503, 79th Cong., 2d Sess. 2 (1946) (emphasis added). The courts interpreted this provision narrowly, see Merrill v. Builders Ornamental Iron Co., 197 F.2d 16, 25 (10th Cir.1952) ("unfairness or bad faith on the part of the losing party, or ... some other equitable consideration such as vexatious or wholly unjustified litigation which makes it grossly unjust for the prevailing party ... to bear the burden of his own counsel fees") (citations omitted) (reversing district court fee award), and Congress emphasized the appropriateness of a narrow reading by rewording the provision in 1952 to allow for fee awards only in "exceptional cases." See Act of July 19, 1952, ch. 950, sec. 1, Sec. 285, 66 Stat. 792, 813 (codified at 35 U.S.C. Sec. 285)
 
 
 [4]
 The majority intimates that "unreasonable" conduct may be enough to support an award of fees. See Maj.Op. at 526. For this proposition, the majority cites Hodge Chile Co. v. KNA Food Distribs., 575 F.Supp. 210 (E.D.Mo.1983), aff'd, 741 F.2d 1086 (8th Cir.1984). In that case, the district court declared that attorneys' fees could be awarded under section 35 when the plaintiff's action is "groundless, unreasonable, vexatious, or was pursued in bad faith." Id. at 214. As the Hodge court denied the request for attorneys' fees, it had no need to explain further its string of adjectives. In support of that string, Hodge first relied upon Sanford Research Co. v. Eberhard Faber Pen & Pencil Co., 379 F.2d 512 (7th Cir.1967), a patent case, in which the court refused to grant attorneys' fees because they " 'should not be awarded ... except to prevent gross injustice and where fraud and wrong-doing are clearly proved.' " Id. at 516 (quoting Sarkes Tarzian, Inc. v. Philco Corp., 351 F.2d 557, 560 (7th Cir.1965)). Hodge also relied upon Scott v. Mego Int'l Inc., 524 F.Supp. 74 (D.Minn.1981), another case refusing to grant fees, which contains no explicit elaboration of the word "exceptional" within the meaning of the patent statute. These cases do not support a lower standard for attorneys' fees than that suggested in text
 In any event, the decisions courts have made on particular facts are much more illuminating than the various verbal tests suggested. The majority does not discuss the facts in any previous case awarding or denying fees under section 35. The results in those cases consistently suggest that "unreasonable" conduct only justifies a fee award if the court may infer unconscionably reckless disregard for the truth or subjective bad faith from the totally irresponsible character of a litigant's legal positions or conduct. See Diamond Supply Co. v. Prudential Paper Prods. Co., 589 F.Supp. 470, 476-77 (S.D.N.Y.1984) (fees awarded where suit against one defendant was "patently baseless" and plaintiff presented "virtually no evidence" against it, as this conduct amounted to "bad faith and harassment"); see also infra note 12. See generally 1 M. Derfner & A. Wolf, Court Awarded Attorney Fees p 10.05[b] at 10-59 (1984) ("Very few awards [in patent actions] have been made upon a finding that a losing party's actions were merely reckless or frivolous, absent, at the very least, an inference that they were also motivated by bad faith, malice, or vexatiousness.") (footnote omitted).
 
 
 [5]
 I do not mean to imply approval or disapproval of the district court's discussion and disposition of the merits
 
 
 [6]
 Under 28 U.S.C. Sec. 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." While I continue to agree with our decision to dismiss, this case might well have been eligible for transfer. Cf. National Standard Co. v. Garbalizer Corp. of Am., 200 USPQ (BNA) 591, 594 (N.D.Ohio 1977); Transamerica Corp. v. Transfer Planning, Inc., 419 F.Supp. 1261 (S.D.N.Y.1976)
 
 
 [7]
 Cf. Hughes Aircraft Co. v. Messerschmitt-Boelkow-Blohm, GmbH, 625 F.2d 580, 584-85 (5th Cir.1980) (affirming denial of fees in patent case dismissed for want of subject-matter jurisdiction on ground that jurisdictional question was arguable), cert. denied, 449 U.S. 1082, 101 S.Ct. 868, 66 L.Ed.2d 807 (1981); Black & Decker Mfg. Co. v. Disston, Inc., 184 USPQ (BNA) 17 (N.D.Ga.1974) (denying fees in patent case for laying improper venue where no bad faith or intent to harass appeared). Although Black & Decker can be read to imply that harassing a defendant by suing in an improper district might sometimes support a fee award, the facts of cases granting awards in other contexts show that the relevant sense of harassment implies malice or unconscionable conduct, neither of which is present here
 
 
 [8]
 For example, consider a plaintiff who had been guilty of carelessness in venue selection similar to Noxell's, but who asserted possibly meritorious damages claims that would be time-barred if the suit were dismissed. I would very likely vote to transfer such a suit "in the interest of justice" rather than dismiss it, and if that position prevailed, attorneys' fees would probably not be available to the defendant. But the effect of transferring such a suit and granting a fee award in this one is to have the availability of attorneys' fees turn on the irrelevant question of whether the statute of limitations has run on any claims
 Because the majority mischaracterizes my argument on this point, see Maj.Op. at 524 n. 1, I restate my example in more abstract terms. I mean to point out that, in general, courts often consider factors unrelated to the blameworthiness of the plaintiff's forum selection in deciding whether to transfer or dismiss an action under section 1406(a). Whether the statute of limitations has run on any possibly meritorious claims asserted by the plaintiff is a particularly obvious example of such a factor that courts can and do consider. But if the courts consider any factors other than the blameworthiness of the plaintiff's forum selection in deciding whether to transfer or dismiss, it necessarily follows that some plaintiffs will suffer dismissal while other equally blameworthy plaintiffs suffer only transfer. Thus, the class of plaintiffs against whom defendants prevailed by obtaining dismissal will include plaintiffs who did nothing worse than other plaintiffs whose cases were transferred for reasons unrelated to blame. But it is hardly equitable to award fees against some plaintiffs if there are equally guilty plaintiffs who escaped dismissal and against whom fees thus apparently cannot be awarded under section 35. Courts can avoid that unfair result only if they follow the rule stated in the text above; and if this court were to follow it in this case, fees would not be awarded.
 
 
 [9]
 Although Tefal, like many subsequent cases, attributed the "more than miniscule" test to Honda Assocs., Inc. v. Nozawa Trading, Inc., 374 F.Supp. 886 (S.D.N.Y.1974), whether Honda Assocs. adopted any such test is open to serious challenge. In Honda Assocs., the basic rule the district court evidently followed was that "in determining where 'the claim arose,' the weight of defendant's contacts ... must be compared, and the claim must be deemed to have arisen in the district where the contacts had been most significant." Id. at 891; see also id. at 892. In assessing the facts before it, the court commented that venue was improper because "the claim should not be deemed to have arisen in a district in which the defendant has had only miniscule contact." Id. at 892. The court did not state that any contacts greater than miniscule would suffice. Some trademark cases decided since Leroy have adopted a contacts test based partly on Honda Assocs. that permits venue to be laid in a district which may have noticeably fewer "contacts" with the litigation than some other district. See Children's Television Workshop v. Mary Maxim, Inc., 223 USPQ (BNA) 965, 967-68 (S.D.N.Y.1984) (although defendant's "contacts with the Eastern District of Michigan clearly exceed its contacts with this district," contacts are "not miniscule" and "substantial," so venue is proper); Technical Publishing Co. v. Mayne, 206 USPQ (BNA) 284, 285-87 (N.D.Ill.1979) ("substantial" contacts support venue, even assuming contacts with other district are greater)
 
 
 [10]
 Noxell did not cite all these cases, although it did cite Mida Mfg. and Chicago Reader. We cannot assume from that fact that Noxell did not know of the others. Moreover, even the cases that did not actually encourage Noxell to adopt its theory of venue show that confusion about venue in trademark cases persisted after Leroy. We should not condemn Noxell's argument as completely irresponsible merely because it reflected that confusion
 
 
 [11]
 My argument is not, of course, that Noxell deliberately decided to sue two defendants on a venue theory that would support venue against only one of them, with the plan that it would drop the other defendant eventually. See Maj.Op. at 527 n. 3. I maintain, and the majority does not dispute, that Noxell, possibly suspecting that the court would not accept its theory of where the claim arose, proffered a substantial fallback argument that would have preserved its action against the main defendant. Although Noxell asserted its second theory very tardily, the existence of such a theory is plainly relevant to whether this case is "exceptional." More generally, the support in some authorities for Noxell's argument casts further doubt on the majority's repeated implication that no reasonable person could think it at all just that Firehouse might have to defend against Noxell's suit in the District of Columbia
 
 
 [12]
 For its suggestion that "economic coercion" in this case supports attorneys' fees, the majority relies on Comidas Exquisitos, Inc. v. Carlos McGee's Mexican Cafe, Inc., 602 F.Supp. 191 (S.D.Iowa 1985), another case in which attorneys' fees were refused. The court thus did not elaborate on its conclusion that attorneys' fees could be awarded in cases "involving bad faith, frivolous claims, or economic coercion," a proposition for which it cited three more cases rejecting fee applications. See id. at 199. Fees were awarded to a defendant partly because the plaintiff brought a meritless and economically coercive action in General Motors Corp. v. Cadillac Marine & Boat Co., 226 F.Supp. 716 (W.D.Mich.1964), the extreme facts of which are discussed in text. See supra at p. 523; see also Parker Rust Proof Co. v. Ford Motor Co., 23 F.2d 502, 506 (E.D.Mich.1928) (fees awarded to plaintiff, a small corporation, where defendant Ford Motor Co. had actual knowledge of its infringement, restricted access to the plant area where the infringement occurred to conceal its illegal activity, had an apparent policy to make litigation as expensive as possible for opponents, drove up the cost of the suit unnecessarily by devices that included presentation of later discredited experimental data, and had stated that it "was absolutely opposed to the present patent system and to the payment of royalties to any one"); cf. Steak & Brew, Inc. v. Beef & Brew Restaurant, Inc., 370 F.Supp. 1030, 1038 (S.D.Ill.1974) (refusing fee application based partly on economic coercion argument)